912 A.2d 146 (2006)
389 N.J. Super. 144
STATE of New Jersey, Plaintiff-Respondent,
v.
Walter TUTHILL, Defendant-Respondent.
Safety National Cas. Corp., Surety-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 2006.
Decided December 8, 2006.
*147 Samuel M. Silver, argued the cause for appellant Safety National Casualty Corporation.
Manners & Associates, Westbury, NY, for respondent Walter Tuthill (Robert M. Manners, on the brief).
James F. Ferguson, County Counsel, for respondent State of New Jersey (William P. Busch, Jr., Assistant County Counsel, filed a statement in lieu of brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is whether a surety's obligation on a bail bond is released by a court's mistaken cancellation of the bond. We hold that absent a showing by the surety of detrimental reliance or a material increase in the risk originally undertaken, a court is not bound by its error, has the power to correct it, and acts within its discretion in ordering the bond reinstated without the surety's consent.
*148 This dispute originated in the arrest of defendant Walter Tuthill (defendant or principal) for sex crimes involving a minor. The judge before whom Tuthill appeared set bail at $250,000 on July 29, 2004. Unbeknownst to the judge and prosecutor at the time bail was fixed was the fact that defendant had a prior sex crime conviction. Three days later, on August 1, 2004, defendant obtained a surety, Safety National Casualty Corporation (Surety), who posted a bail bond in the amount of $250,000 in exchange for a non-refundable fee of $25,000. The indemnitor on the bond was defendant's father.
There is no indication that defendant, awaiting grand jury proceedings, breached any of the terms of the surety agreement or failed to appear in court at all times required of him. On December 3, 2004, only four months after bail was posted, Surety was notified by court personnel that the bond was discharged. The bond was therefore deemed satisfied and it was returned to Surety along with an unsigned "order to discharge recognizance." There was no security to be released but, according to Surety, as a result of the discharge the company ceased monitoring the whereabouts of defendant or the fiscal stability of the father.
Seven months later, in July 2005, it was discovered that the discharge was the result of an error by either court personnel or the prosecutor's office based on the mistaken belief that the grand jury returned a "no bill" in favor of defendant. Actually, the grand jury had issued a "no action," allowing the State to continue its criminal investigation, which eventually resulted in the return of an indictment for which defendant stood trial and was ultimately acquitted of all charges.
In any event, at a hearing on July 13, 2005, without notice to Surety, the court, finding the bond had been erroneously cancelled, ordered the bail bond reinstated. On July 18, 2005, the court amended its order to require the return of the original bail bond. When the original bond could not be located, the court further ordered, at a subsequent bail reduction hearing on July 27, 2005, where Surety was present and voiced objection, that the Surety issue a new $250,000 bond for defendant by August 3, 2005. After we denied an emergent application for relief from that order, Surety complied. This appeal follows.
A bail bond amounts to essentially a contract between a principal and his surety on the one hand, and the government as creditor on the other, governed by "the legal principles applicable to [suretyship]." State v. Weissenburger, 189 N.J.Super. 172, 176, 459 A.2d 693 (App. Div.1983); see also State v. Clayton, 361 N.J.Super. 388, 395, 825 A.2d 1155 (App. Div.2003); State v. Ceylan, 352 N.J.Super. 139, 143, 799 A.2d 685 (App.Div.2002); State v. Vendrell, 197 N.J.Super. 232, 236, 484 A.2d 720 (App.Div.1984); State v. Gonzalez, 69 N.J.Super. 283, 286-87, 174 A.2d 209 (App.Div.1961); R. 3:26-4(a). The extent of the surety's undertaking is defined by the terms of the bail agreement. State v. Ceylan, supra, 352 N.J.Super. at 143, 799 A.2d 685. In this regard, "[i]t is a well-settled principle of suretyship that the surety is only chargeable according to the strict terms of its undertaking and that, as a result, its obligation cannot be extended or altered beyond the terms of its agreement." State v. Clayton, supra, 361 N.J.Super. at 395, 825 A.2d 1155; see also Monmouth Lumber Co. v. Indem. Ins. Co. of N. Am., 21 N.J. 439, 452, 122 A.2d 604 (1956). Consequently, a modification of the terms of a bail contract "by the principal and creditor without the surety's consent operates to discharge the surety, if the modification materially increases the risk assumed." State v. Ceylan, supra, *149 352 N.J.Super. at 143, 799 A.2d 685; see also State v. Clayton, supra, 361 N.J.Super. at 395, 825 A.2d 1155; State v. Weissenburger, supra, 189 N.J.Super. at 176, 459 A.2d 693; Restatement of Security, § 128(b)(i) at 340-41 (1941) ("Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time of payment the compensated surety is discharged if the modification materially increases his risk. . . . ").
The situation in State v. Clayton, supra, presented just such an increased risk. There, a trial judge, without notice to or consent of the surety, reinstated the original bond and again released a defendant who had fled and been later apprehended and returned to custody by the surety. 361 N.J.Super. at 394, 825 A.2d 1155. We held the court's unilateral decision "from the standpoint of basic surety law a nullity," id. at 395, 825 A.2d 1155, reasoning that the defendant's failure to appear materially increased the risk of the undertaking and rendered questionable at best the "surety's willingness to underwrite a further bail. . . ." Ibid.
The bondsman's risk was also materially adversely affected by the government's action in State v. Weissenburger, supra. That case involved a plea agreement, of which the bondsman was not informed, in which in exchange for all charges being dropped, the defendant was permitted to relocate, in violation of the bond, and agreed to assist the government in obtaining evidence against suspected drug distributors. 189 N.J.Super. at 174, 176, 459 A.2d 693. There we held that the government should not be allowed to recover against the surety for not producing the principal, when it had itself consented to the defendant's placing himself beyond its reach and control.
Obviously, not every modification or change in the conditions of pretrial release will materially increase the surety's risk, or impose on the surety fundamentally different obligations than those originally undertaken. See, e.g., Wiegand v. State, 363 Md. 186, 768 A.2d 43, 50 (2001) ("The modification [to permit defendant to leave the jurisdiction for a period of approximately three weeks] did not create a substituted contract or impose risks `fundamentally different' from those undertaken. Nor did the modification `materially increase[]' the risk the bondsman accepted."); State v. Vaughn, 11 P.3d 211, 214-15 (Okla.2000) (the prosecution's decision to add new charges, arising from the original transaction, which increased defendant's maximum possible sentence "did not materially increase the Bondsman's bargained-for risk"); see also United States v. Egan, 394 F.2d 262, 265-66 (2d Cir.) (an order that originally required defendant to report daily to the marshal, later modified to require reporting at ten day intervals, did not enlarge the conditions of bail or enhance the chances of absconding), cert. denied, 393 U.S. 838, 89 S.Ct. 116, 21 L.Ed.2d 109 (1968); United States v. Gambino, 809 F.Supp. 1048, 1056-60 (S.D.N.Y. 1992) (holding that, under the facts of the case, the removal of the electronic bracelet monitoring devices from defendants did not constitute a significant change in the bail conditions and thus did not increase risk of flight), aff'd, 17 F.3d 572 (2d Cir. 1994); People v. Tyler, 797 P.2d 22, 26 (Colo.1990) (subsequent withdrawal of guilty plea did not increase the risk the surety originally accepted); People v. Smith, 673 P.2d 1026, 1027-28 (Colo.Ct. App.1983) (where the bail bond agreement stated that the "defendant shall . . . not depart [the court] without leave," there was no material change in the condition of the bond contract where the trial court permitted defendant's absence at a scheduled *150 hearing); People v. Rincon, 43 Colo. App. 155, 603 P.2d 953, 954-55 (1979) (there was no material alteration to the surety contract where the trial court permitted defendant to leave the state on the condition that defendant agreed not to leave without permission). In each of these cases, the court's modification of the conditions of a defendant's pretrial release were found not to have significantly increased the bondsman's risk of the defendant's flight and non-appearance at trial as to justify the discharge of the bondsman's obligation under the bail bond.
Here, Surety contends that it detrimentally relied on the court's cancellation of the bond by ceasing to monitor both its principal and indemnitor, and that reinstatement of the bond materially increased the risk of defendant's flight because of its belated discovery of defendant's prior sex conviction. We disagree with all these contentions.
In the first place, the mistaken cancellation of the bond, based on either a miscommunication or erroneous information from the prosecutor's office, amounts, in our view, to a clerical error by which the court is not bound and has the clear power to correct. R. 1:13-1. This situation is analogous to that in United States v. Martinez, supra. There, while the defendant's criminal conviction was on appeal and his bail continued by court order, a secretary in the United States Attorney's office mistakenly sent a form letter to the clerk of the district court instructing the clerk to cancel the bond. The letter was not signed by the United States Attorney but, apparently following standard procedure, the clerk stamped "cancelled of record" on the face of the bond and sent a certificate of discharge to the surety's agent. United States v. Martinez, 613 F.2d 473, 475 (3d Cir. 1980). After the conviction was affirmed on appeal, the defendant failed to surrender. Id. at 476. Well over a year after the purported cancellation of the bond, the United States Attorney discovered the error and moved, albeit without notice to the defendant's attorney or to the surety, for reinstatement of the bond. Ibid. Finding no evidence of reliance on the clerk's cancellation, the district court granted the motion, id. at 476, and the Court of Appeals affirmed, holding that "[t]he district judge . . . acted within his discretion in ordering the bond reinstated, pursuant to his power to correct clerical errors under Fed.R.Civ.P. 60(a) or Fed. R.Crim.P. 36, and in ordering the bond forfeited." Id. at 482 (footnote omitted). The same result pertains here. We therefore conclude that the mistaken cancellation of the bond, once the error was discovered and corrected, is not a valid basis for the discharge of the compensated bondsman in this case.
Surety nevertheless argues that unlike its counterpart in Martinez, here it relied on the purported cancellation to its detriment. Yet, Surety fails to explain how its failure to monitor defendant's whereabouts and his father's financial condition in the intervening seven months inured to its disadvantage or resulted in any prejudice. No claim is made that defendant failed to appear as required at any court appearances and indeed, defendant was ultimately acquitted of the underlying criminal charges. Nor does Surety claim the release or impairment of any security or collateral due to its reliance on the court's cancellation of the bail bond. Simply put, we discern from the record no detrimental reliance on the mistaken cancellation of the bail bond in this instance.
Nor does the record support Surety's argument that the court's action materially altered the bail contract and significantly increased its risk. The court did not attempt to change any of the terms of the surety agreement or the conditions of defendant's pretrial release. In this regard, there has been no showing that the court's *151 action was inconsistent with the terms of the bail bond or made it less likely that defendant would appear. In other words, Surety has failed to demonstrate how the risk of defendant "jumping bail" has been augmented or was more than it had originally bargained for.
To be sure, in the intervening seven months between cancellation and reinstatement, Surety belatedly discovered defendant's prior conviction of a sex crime. However, unlike the situation in Clayton, supra, and Weissenburger, supra, where the risk of flight in each case was heightened by events occurring after the trial court's action, here defendant's criminal record predated the posting of the bond by Surety. We fail to see how the preexisting condition of defendant's criminal history worsened the chance of flight simply by virtue of its belated discovery in the seven-month interval. The bargain initially struck among the principal, Surety and the State did not change as a result of events occurring subsequent to the court's erroneous release of the bond. Indeed, the only change in circumstance concerned Surety's after-acquired knowledge and not the actual commission of any intervening crime, which admittedly would reasonably lead a surety to reassess its risk. Nonetheless, as to the former, we are satisfied that Surety's failure to fully inform itself of the risk it was assuming for compensation does not relieve Surety from its responsibility under the bond obligation. Thus, the burden of its failure to conduct a complete due diligence of its principal must fall on the surety who willingly assumed the compensated risk at the outset of its undertaking.
We think this result both fair and equitable. A surety in New Jersey may set whatever premium on bail bonds the market will bear. Moreover, each time a bond is executed, the surety collects a new premium representing a set percentage of the amount of the bond. Thus, if in this case the court's action in canceling the bond were effective, defendant would have had to pay another premium even though the risk of flight had not, all things considered, increased, and Surety had incurred no additional expenses in the meantime. Under these circumstances, such a result would create a windfall for Surety who, as noted, assumed no greater risk than that originally bargained for and expended no greater sums due to the court's mistaken cancellation of the bond.
Although it is the responsibility of the judge in the first instance to assess the risk, and the amount set for bail is tailored to the court's evaluation of the risk, it is ultimately the responsibility of the surety to make an independent risk calculation in its dealings with criminal defendants. Interestingly enough in this case, when defendant's criminal record information was eventually brought to the court's attention, the judge continued bail at the original level, denying the State's motion to increase bail on account of the belated discovery. The reasonable inference from the court's decision is that any increased probability of flight was discounted by the lack of any changed circumstance since defendant's prior conviction preexisted the posting of bail and therefore Surety was not subjected to any greater risk of liability than it had bargained for. As the court in United States v. Martinez, supra, noted, "[w]hen a trial judge has implicitly determined, by continuing bail at the same amount, that the risk of flight is no greater . . ., the surety should not automatically be allowed to collect another premium." 613 F.2d at 480.
For all these reasons, therefore, we find the court's unilateral decision to reinstate the bail bond without Surety's consent to be a proper exercise of its power to correct *152 its previous error, and that the court's action neither materially increased Surety's risk nor resulted in any other adverse consequence. Of course, it would have been preferable if the order of reinstatement followed notice to Surety and a full opportunity to be heard. Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995); Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985). However, the simple fact is that Surety eventually did appear in the matter and has failed to advance any reason, either below or on appeal, why its obligation on the bail bond should not have been continued. We conclude that in the absence of any detrimental reliance on the court's cancellation action, or any material increase in the flight risk occasioned thereby, Surety was not entitled to be discharged from its original obligation and therefore was properly ordered to either reinstate the bond to which it already had committed or, if lost, post a new bond.
Affirmed.