NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-0974-14T1
             A-0975-14T1
             A-0976-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CESAR MUNGIA,

    Defendant,

and

U.S. SPECIALTY INSURANCE
COMPANY,

    Surety-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| July 20, 2016 |
| APPELLATE DIVISION |

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTIAN RODRIGUEZ,

    Defendant,

and

AMERICAN RELIABLE INSURANCE
COMPANY,

    Surety-Appellant.

_____

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

ALEXIS MELENDEZ,

Defendant,

and

AMERICAN RELIABLE INSURANCE
COMPANY,

Surety-Appellant.

_____

Argued April 5, 2016 — Decided July 20, 2016

Before Judges Hoffman, Leone and Whipple.[1]

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 11-10-1491 (A-0974-14), 11-09-0101 (A-0975-14), and 10-07-0938 (A-0976-14).

Richard P. Blender argued the cause for the appellants.

William J. Maslo argued the cause for respondents State of New Jersey and County of Middlesex (Florio Kenny Raval, L.L.P., attorneys; Edward J. Florio, of counsel; Michael T. Wilkos, on the brief).

The opinion of the court was delivered by

LEONE, J.A.D.

_____

[1] Judge Whipple did not participate in oral argument. She joins the opinion with counsel's consent. R. 2:13-2(b).

While released on bail, defendants Cesar Mungia, Christian Rodriguez, and Alexis Melendez separately fled from the United States. The State apparently did not seek extradition. The sureties who posted their bail, appellants U.S. Specialty Insurance Company (U.S. Specialty) and American Reliable Insurance Company (American Reliable) (collectively the sureties), appeal the trial court's orders forfeiting 70% of each defendant's bail and remitting 30% to the sureties.

We hold that if a defendant becomes a fugitive and flees to a foreign country, there is a presumption against remission. The surety must make every effort to assist in the re-apprehension of the defendant, including by locating the defendant in the foreign country. The failure to extradite a located defendant does not excuse the sureties from their contract with the State, and generally does not justify remission if the State has no ability to obtain extradition of the defendant. However, if the surety locates the defendant in a foreign country, and extradition is possible, but the State elects not to request that the federal government seek extradition, there is no absolute bar against remission. In that situation, the trial court should consider the general factors governing remission. Finding no abuse of discretion in

the trial court's consideration of those factors in these cases, we affirm.

## I.

The following facts were asserted in the certifications supporting the sureties' motions for remission.

## A.

Mungia was released on bail on June 18, 2011. U.S. Specialty posted bail in the amount of $40,000 to secure Mungia's appearance in court on April 24, 2012. U.S. Specialty's agent, Speedy Bail Bonds (Speedy), was tasked with supervising Mungia. Speedy's agent in charge of supervising Mungia was Jose Tavares. Tavares and his coworkers kept "in close contact with" Mungia to "assure his presence in court." Mungia had to report to Tavares' office by telephone on a regular basis. Over several months, Mungia reported in thirty-nine times.

On April 24, 2012, Mungia failed to appear in court. Tavares and Speedy "immediately began an investigation." Speedy called Mungia's home, family members, and friends in an attempt to locate him. None of these efforts were successful. Investigators monitored Mungia's last known home address but were unable to locate him. Soon after Mungia failed to appear, U.S. Specialty hired New Jersey State Private Detective and

Fugitive Recovery Agent, Ron Padron, who authored a report on his efforts to locate Mungia.

In October 2012, Padron received a call from an informant indicating that Mungia was working on a farm in Virginia. Padron traveled to the farm and learned that Mungia had been working there under the name Hector Palo. After trying to locate Mungia for several months in Virginia, Padron learned that he had fled to Tela, Honduras. Padron reported this information to the Middlesex County Prosecutor's Office. There is no indication in the record that the State sought Mungia's extradition.

## B.

Rodriguez was released on bail on June 25, 2010. Speedy, on behalf of American Reliable, posted bail in the amount of $150,000. Again, Tavares and his coworkers were tasked with supervising Rodriguez while he awaited trial, and "kept in close contact" with Rodriguez. Between July 5, 2010, and March 26, 2012, Rodriguez reported to Tavares via telephone eighty-nine times. In April 2012, Rodriguez stopped reporting. He failed to appear for court on June 28, 2012. Tavares began an investigation, but was ultimately unable to find Rodriguez. As a result, he hired Padron on July 29, 2012.

In September 2012, Padron received a phone call from a blocked number. The caller informed Padron that Rodriguez was in the "DR" and to look in "San Cristobal." Padron immediately contacted an investigator in the Dominican Republic, who found Rodriguez's Dominican Republic national identification number. Padron learned that Rodriguez was working at a gas station in Hatillo, San Cristobal Province. Padron's investigator traveled to Hatillo and took pictures of Rodriguez at the gas station where he works, and obtained Rodriguez's home address.

Padron and Tavares forwarded this information to the New Jersey Department of Law and Public Safety, the law enforcement agency tasked with prosecuting Rodriguez. There is no indication in the record that the State sought Rodriguez's extradition.

## C.

Melendez was released on bail on June 8, 2010. Speedy, on behalf of American Reliable, posted bail in the amount of $50,000. Again, Tavares was charged with supervising Melendez and ensuring his appearance in court. Tavares and his coworkers "kept in close contact" with Melendez. Between June 14, 2010, and February 6, 2012, Melendez reported to Tavares' office via telephone eighty-four times. However, Melendez failed to appear at his February 16, 2012 court date. Tavares and his office

immediately began an investigation in which they called Melendez's family members, surveilled his last known address, and spoke with neighbors and friends. After failing to locate Melendez, Tavares hired Padron in September 2012. Following leads, Padron's investigators traveled to Florida to search for Melendez, without success.

In November 2012, Padron used a fake Facebook account to befriend Melendez's girlfriend. Padron learned that Melendez was communicating with her using a Facebook account under the name "Omar Diaz." Padron then created another fake Facebook account, used it to contact Melendez, and began having daily conversations with him. Padron learned that Melendez was currently living in Cali, Colombia, and he obtained an address. Padron forwarded this information to the Middlesex County Prosecutor's Office. There is no indication in the record that the State sought Melendez's extradition.

### D.

In each of the three cases, defendants' bails were forfeited. The sureties moved to vacate the bail forfeitures based on the State's failure to obtain extradition of the three defendants. Judge Diane Pincus heard all three motions together on August 21, 2014. She found that the "State would receive a windfall in these cases if remission was denied, since whether

or not the Defendants remain fugitives is directly tied to the State's decision of whether or not to extradite."

In orders dated August 26, 2014, and September 9, 2014, the judge denied the sureties' motions to vacate forfeiture but modified the forfeiture to award the sureties 30% remission. The judge ordered the sureties to pay the remaining 70%, to be distributed proportionally to respondents, the State and the County of Middlesex. On September 22, 2014, the judge stayed payment of the 70% pending appeal.

The sureties appeal the trial court's decisions not to award more than 30% remission, arguing:

> POINT I — A SURETY IS ENTITLED TO RELIEF FROM A BAIL FORFEITURE WHEN THE STATE REFUSES TO EXTRADITE THE DEFENDANT.
>
> POINT II — A SURETY IS ENTITLED TO RELIEF FROM A BAIL FORFEITURE WHEN ITS PERFORMANCE IS RENDERED IMPOSSIBLE BY THE STATE'S REFUSAL TO EXTRADITE THE DEFENDANT.
>
> POINT III — A SURETY IS ENTITLED TO SUBSTANTIAL REMISSION WHEN IT FULFILLS ITS OBLIGATIONS ON THE BOND.

## II.

The "decision to remit [forfeited bail] and the amount of remission lies essentially in the discretion of the trial court." State v. Ventura, 196 N.J. 203, 213 (2008) (citing State v. Peace, 63 N.J. 127, 129 (1973)). We analyze such

A-0974-14T1

decisions for an "abuse of discretion." Id. at 206. We must hew to this standard of review.

### III.

"[A] bail bond 'constitutes a surety agreement in which the defendant is the principal and the creditor is the State.'" State v. Ceylan, 352 N.J. Super. 139, 143 (App. Div.) (citation omitted), certif. denied, 174 N.J. 545 (2002). "The primary purpose of the surety agreement is to ensure that the defendant will appear at all required court appearances until a final disposition of charges against him is reached." Ibid.

"[U]pon the breach of a condition of bail, the court on its own motion shall declare a forfeiture, and absent an objection by the surety seeking to set the forfeiture aside, a judgment of forfeiture shall be entered within 75 days after the declaration of forfeiture." State v. de la Hoya, 359 N.J. Super. 194, 198 (App. Div. 2003) (citing R. 3:26-6(a)). "The court may, either before or after the entry of judgment, direct that an order of forfeiture or judgment be set aside, in whole or in part, if its enforcement is not required in the interest of justice upon such conditions as it imposes." R. 3:26-6(b). "[W]hen forfeiture is not set aside and satisfied," and a judgment of forfeiture is entered, "the court may remit it in whole or in part in the interest of justice." R. 3:26-6(c). A surety "seeking to set

aside or remit a forfeiture bears the burden of proving that 'it would be inequitable to insist upon forfeiture and that forfeiture is not required in the public interest.'" State v. Mercado, 329 N.J. Super. 265, 269-70 (App. Div. 2000) (citation omitted).

To assist trial courts with bail remission motions, the New Jersey Administrative Office of the Courts issued Directive #13-04[2] in 2004, updated in pertinent part in 2008 in the Supplement to Directive #13-04 [hereinafter Supplement].[3]  The Supplement's Remission Schedule 1, entitled "No Remission," provides: "Where the defendant remains a fugitive when the remission motion is made, the essential undertaking of the surety remains unsatisfied, and the denial of any remission is entirely appropriate." Supplement, supra, at 6 (citing State v. Harmon, 361 N.J. Super. 250, 255 (App. Div. 2003)).  This reflects the general "presumption against remission" where the defendant has not been returned.  Ventura, supra, 196 N.J. at 220.  "In most cases, remission of bail will not be appropriate unless the

---

[2] Directive #13-04, Revision to Forms and Procedures Governing Bail and Bail Forfeitures (Nov. 17, 2004), http://www.judiciary.state.nj.us/directive/criminal/dir_13_04.pdf.

[3] Supplement to Directive #13-04, Bail — Further Revised Remittitur Guidelines (Nov. 12, 2008), http://www.judiciary.state.nj.us/directive/2008/dir_13-04_Supplement_11_12_08.pdf.

defendant has been returned to the jurisdiction of the court." Id. at 218.

However, there may be an exception when the government's action prevents the recapture of the fugitive. That exception has been explored in the area of deportation. In State v. Poon, 244 N.J. Super. 86, 101 (App. Div. 1990), the defendant, while complying with his bail conditions, attended an immigration hearing, as a result of which the federal government deported him to Hong Kong. In that context, we felt it was "inappropriate to adopt a per se rule prohibiting any remission." Id. at 101. Instead, we ruled that trial courts should consider the "efforts of the defendant and the surety to return defendant to this jurisdiction," and "the State's position regarding the need for defendant's return to the forum for prosecution," as "the equities might be different if the State elects . . . not to extradite or return a defendant for prosecution . . . when it can do so." Id. at 101-02.

Subsequently, in Ventura, supra, our Supreme Court addressed whether and how much bail remission was appropriate when a defendant has been deported from the United States. 196 N.J. at 206. In Ventura, after being released on bail, two defendants failed to appear at their scheduled court dates. Id. at 206. One defendant was eventually incarcerated in Canada and

then deported to the Dominican Republic.  Id. at 207-08. Meanwhile, the other defendant was eventually incarcerated in another state and then deported to Colombia.  Id. at 209-10. After deportation, the sureties sought remission of the defendants' bail.  Id. at 208-09, 210-11.

Our Supreme Court noted that the "general principles concerning bail remission are not a perfect fit when a defendant is deported from the United States while on bail."  Id. at 216. The Court recognized that in Poon, we "rejected an automatic rule against remission solely because the defendant had not been returned."  Ventura, supra, 196 N.J. at 216-18.  The Court agreed there could be circumstances in which the "impossibility of securing the defendant's presence may play a role in assessing a surety's motion for remission and in the appropriate case, relief may be granted."  Id. at 216 (citing Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 369, 21 L. Ed. 287, 290 (1873) ("It is the settled law of this class of cases that the bail will be exonerated where the performance of the condition is rendered impossible by the act of God, the act of the obligee, or the act of law.")).

Our Supreme Court in Ventura held that "when deportation is the sole reason a defendant is unable to attend court, a crucial factor that the trial court should consider is whether the

defendant was a fugitive from New Jersey at the time of deportation." Id. at 218. The Court held that if the defendant is compliant with bail conditions when deported, as in Poon, "some degree of remission should be considered." Ibid. However, the Court held that if "the defendant was a fugitive when captured and then subsequently deported," then "remission generally should be denied." Ibid.[4] Thus, the Court ruled that, because the defendants had been fugitives when captured and deported, each was "essentially a fugitive when the motion was made, [and] the denial of remission was appropriate." Id. at 219. The Court added that "[a] surety's essential responsibility is to guarantee not only the defendant's appearance at the scheduled court proceedings, but that if the defendant is deported to make every effort to re-apprehend the defendant." Id. at 221.

Poon and Ventura addressed deportation, where the government causes the removal of the defendant from the United States. Nonetheless, Ventura and Poon suggest precepts courts can apply in deciding whether remission is appropriate when defendants flee abroad. First, such defendants were fugitives when they fled abroad, so there is a presumption against

---

[4] Ventura's holdings were incorporated in the Supplement, supra, at 4.

remission.  See Ventura, supra, 196 N.J. at 216, 219-20. Second, the surety must make every effort to assist in the re-apprehension of the defendants, including by locating them in the foreign country to which they have fled.  See id. at 221.

Third, the failure to extradite a located defendant does not excuse the sureties from their bail contract with the State, and normally would not justify remission if the State has no ability to obtain extradition of the defendant.  Thus, remission is generally inappropriate if there is no extradition treaty with the foreign country, if the State requests and the federal government seeks extradition but the foreign country declines to extradite, or if the State makes a good faith request for extradition but the federal government declines to seek extradition.  See Poon, supra, 244 N.J. Super. at 101.  "It cannot be doubted that the power to provide for extradition is a national power; it pertains to the national government and not to the States."  Valentine v. United States, 299 U.S. 5, 8, 57 S. Ct. 100, 102, 81 L. Ed. 5, 8 (1936).  While a surety is as powerless as the State to secure extradition in those circumstances, it is a surety's responsibility to prevent a defendant's flight, including flight to the foreign country.

Fourth, if the surety locates the defendant in a foreign country, and extradition is possible, but the State elects not

14

to request that the federal government seek extradition, there is no absolute bar against remission, as the State's election may change the equities. See Poon, supra, 244 N.J. Super. at 101; see also Ventura, supra, 196 N.J. at 216. The trial court should consider the factors governing remission, including the efforts of the surety to prevent flight to a foreign country, to locate the defendant in the foreign country, and to aid extradition; and the State's reasons for not seeking extradition.

Courts should consider these factors in light of "the necessity of providing an incentive to the surety to take active and reasonable steps to recapture a fugitive defendant. . . . [I]f remission were unreasonably withheld, corporate sureties might be overcautious in their willingness to post bail, resulting in an impairment of an accused's constitutional right to pretrial bail." Ventura, supra, 196 N.J. at 214 (quoting de la Hoya, supra, 359 N.J. Super. at 199); see also Supplement, supra, at 1.

Here, the trial court recognized those concerns. It correctly determined that, under Ventura and Poon, there was no absolute bar against remission. The court then considered the general factors governing remission.

"[A] motion for remission of forfeited bail is assessed in a fact-sensitive manner, weighing a multitude of factors outlined in State v. Hyers, 122 N.J. Super. 177, 180 (App. Div. 1973), and its progeny." Ventura, supra, 196 N.J. at 206. The Supplement incorporates the factors outlined in Hyers and "the relevant caselaw." Ventura, supra, 196 N.J. at 215. The Supplement instructs courts, in determining whether to remit bail and the amount to be remitted, to weigh the following factors:

> 1. Whether the surety has made reasonable effort under the circumstances to effect the recapture of the fugitive defendant. A reasonable effort under the circumstances means an "effective" effort. When there is nothing to be done because the defendant surrendered or was recaptured before the surety had notice, doing nothing is "reasonable."
>
> 2. Whether the applicant is a commercial bondsman.
>
> 3. The degree of surety's supervision of the defendant while he or she was released on bail.
>
> 4. The length of time the defendant is a fugitive.
>
> 5. The prejudice to the State, and the expense incurred by the State, as a result of the fugitive's non-appearance, recapture and enforcement of the forfeiture.
>
> 6. Whether reimbursement of the State's expenses will adequately satisfy the interests of justice. The detriment to the

A-0974-14T1

State also includes the intangible element of injury to the public interest where a defendant deliberately fails to make an appearance in a criminal case.

7. The defendant's commission of another crime while a fugitive.

8. The amount of the posted bail. In determining the amount of a partial remission, the court should take into account not only an appropriate percentage of the bail but also its amount.

[Supplement, supra, at 2-3 (citing Peace, supra, 63 N.J. at 129; State v. Toscano, 389 N.J. Super. 366, 375 (App. Div. 2007); State v. Ruccatano, 388 N.J. Super. 620, 628 (App. Div. 2006); State v. Ramirez, 378 N.J. Super. 355, 365-66 (App. Div. 2005); Harmon, supra, 361 N.J. Super. at 255; de la Hoya, supra, 359 N.J. Super. at 199-200; Mercado, supra, 329 N.J. Super. at 271; Hyers, supra, 122 N.J. Super. at 180).]

In arriving at its decision to remit 30% of the bail for each defendant, the trial court weighed all of these relevant factors. First, the court found that the sureties took "substantial steps" and "all reasonable measures" to locate defendants in foreign countries and report their locations to the relevant law enforcement agencies. Second, the court found both sureties were commercial bondsmen.

Third, the court found the sureties engaged in some level of supervision over defendants by requiring defendants to check-in via telephone. However, the court also found that the sureties could have provided greater supervision, such as by

requiring defendants "to be physically present in their office[s] on a regular basis," which might have kept defendants in the vicinity. On the other hand, the court found the sureties immediately began looking for defendants when it became clear they were no longer calling in on a regular basis.

Fourth, the trial court did not directly comment on the length of time defendants have been fugitives, but the time elapsed since each defendant's failure to appear in court was approximately two years and counting. Fifth and sixth, the trial court declined to weigh heavily the prejudice and expenses incurred by the State and whether reimbursement of the State's expenses would satisfy the interests of justice. This was appropriate, because the State claimed as prejudice only the intangible injury to the public interest whenever a defendant fails to appear, and the State did not argue that it had incurred expenses as a result of defendants' flight. Seventh, the court found that defendants had not committed any additional crimes while fugitives.

Eighth, the trial court considered the "[a]mount of the posted bail." See Supplement, supra, at 2. The court noted the dollar amount of each defendant's bail. The court then found the sureties were entitled to remission of 30% of each

defendant's bail, thus tying the amount remitted to the amount of bail.

The sureties argue that the trial court did not fully consider the amount of the posted bail. Under this factor, courts must consider whether the amount forfeited appropriately compensates the injury to the State, and whether the amount remitted is "so unreasonably small as to discourage future posting of bonds." Toscano, supra, 389 N.J. Super. at 375-76 (disapproving a 20% remission where the defendant was quickly recaptured); de la Hoya, supra, 359 N.J. Super. at 199-200 (changing the remission from 50% to 80% in view of the surety's "successful efforts in recapturing defendant").

Unlike those cases, defendants here have not been recaptured. Thus, the State's injury is deserving of sizeable recompense. Moreover, the trial court's remission of $12,000 regarding Mungia, $15,000 regarding Melendez, and $45,000 regarding Rodriguez compensated the sureties with substantial sums. These sums reflected the sureties' differing efforts to locate Mungia and Melendez (sending investigators to Virginia and Florida respectively, and gathering information here about their location abroad) and to locate Rodriguez (using an investigator in the Dominican Republic to locate and photograph him). Thus, although the trial court found the same percentage

of remission for each case, we cannot say that the court failed to consider adequately the amount of posted bail and the underlying need to compensate both the State and the sureties.

The sureties contend that more substantial remission should have been awarded because of the steps they took in locating defendants in foreign countries and in forwarding this information to the relevant law enforcement agencies. Here, the trial court recognized that the sureties did "everything in [their] power to locate the Defendant[s], including incurring the expense of hiring a Fugitive Recovery Agent." At the same time, the court recognized that the sureties arguably "did not do everything in [their] power to keep these Defendants in the United States," and "failed in [their] singular objective of ensuring the Defendants' presence in court."

We do not hold that 30% would have been the only appropriate remission percentage in these cases, or in any other cases.[5] Remission of bail must be "assessed in a fact-sensitive manner" in each individual case. Ventura, supra, 196 N.J. at 206.

Nonetheless, the amount of remission was "in the discretion of the trial court." Id. at 213. The trial court here

---

[5] We note that the State did not cross-appeal challenging either the amount or percentage of remission in these cases.

considered all of the factors and relevant case law. We agree substantially with the trial court's discussion of these factors. The court determined that fundamental fairness dictated the sureties receive 30% remission. We cannot say that the court abused its discretion.

IV.

The sureties argue that the State's refusal to commence extradition proceedings impermissibly increased the sureties' risk in posting defendants' bail. The sureties cite State v. Weissenburger, 189 N.J. Super. 172, 176 (App. Div. 1983), which states that it is "well settled that if the principal and creditor modify their contract without the consent of a compensated surety, the surety will be discharged if the modification materially increases his risk."

In Weissenburger, the defendant and the State agreed that the defendant would cooperate with the State's investigators to assist them in obtaining evidence against suspected major distributors of controlled dangerous substances. Id. at 174. The prosecutor agreed to provide the defendant with protection, relocation, and new identities, if necessary. Ibid. The agreement also permitted the defendant to leave the State if there was an "emergent threat to his . . . safety." Ibid. The

21

defendant panicked after receiving threats and fled from New Jersey. Id. at 175. We held that

> [t]he dispositive and undisputed fact is that the prosecutor, by way of the agreement with defendant and without notice to the surety, materially altered the condition of the bond and hence the risk and obligation of the surety by authorizing defendant to flee the jurisdiction upon his own determination that an emergent threat against him had been made.
>
> [Id. at 176.]

The sureties also cite Ceylan, where the defendant was released on bail on an eluding charge. Ceylan, supra, 352 N.J. Super. at 141. Later, the defendant was charged with first-degree aggravated manslaughter and released on bail. Ibid. The defendant was first found guilty on the eluding charge. Ibid. Prior to sentencing on the eluding charge, the surety sought exoneration on the bond issued by it on the manslaughter charge, arguing that the guilty verdict on the second-degree eluding charge carried a presumptive term of imprisonment of five-to-ten years, raising the risk of the defendant's fleeing to his native Turkey. Id. at 142. The trial court denied the surety's motions and allowed the defendant to remain free on a higher amount of bail. Ibid. Subsequently, the defendant failed to appear, fled to Turkey, and the bail was forfeited. Ibid. We held that the "post-verdict release of the defendant led to a

material increase in his risk of flight" and the surety "legally could not be compelled to accept that increased risk, even when ameliorated by the imposition of substantial new bail."  Ibid.

Both Weissenburger and Ceylan involved situations where actions by the State or the state court increased the risk of flight before the defendants fled.  Here, by contrast, neither the State nor the trial court did anything to increase the existing risk of flight before defendants fled.  The sureties assumed that risk, and their supervision failed to prevent defendants from fleeing to foreign countries.  The State's post-flight decision not to request extradition could not increase the risk of flight.

Even if the possibility of recapture must also be considered, the result is the same.  Had the State decided to request extradition, extradition was by no means certain.  The federal government could have declined to seek extradition, or the foreign country could have refused to grant extradition, or defendants could have escaped recapture.[6]  Considering those uncertainties, and the uncertainty at the time bail is posted of

---

[6] Cf. State v. Wilson, 395 N.J. Super. 221, 228 (App. Div. 2007) (noting that, where the defendant is incarcerated in the United States, "the surety may be able to demonstrate that the eventual presence of defendants in New Jersey is virtually assured as the result of the operation of the" Interstate Agreement on Detainers).

whether a defendant will flee abroad, the State's decision did not alter the combined possibilities of flight and recapture so materially as to excuse the sureties from their own failure to prevent defendants from fleeing abroad.

V.

Finally, the sureties contend that their performance under the bond agreement was rendered impossible by the State's failure to seek extradition of defendants. "'Impossibility or impracticability of performance are complete defenses where a fact essential to performance is assumed by the parties but does not exist at the time for performance.'" Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 302 (2013) (citation omitted), certif. denied, 217 N.J. 623 (2014). "The inquiry, therefore, is whether the condition 'is of such a character that it can reasonably be implied to have been in the [mutual] contemplation of the parties at the date when the contract was made.'" Id. at 303 (quoting Duff v. Trenton Beverage Co., 4 N.J. 595, 605 (1950)). Here, the sureties have not shown that, at the time bail was posted, both parties assumed that the State always would request extradition if the sureties allowed defendants to flee to a foreign country. See Connell v. Parlavecchio, 255 N.J. Super. 45, 50 (App. Div.), certif. denied, 130 N.J. 16-17 (1992) (impossibility is no defense where one party took the

risk and "did not condition his performance on" the existence of the fact).

Moreover, the State's decision not to request extradition did not mean that it was impossible for the sureties to perform their obligation. The sureties could have prevented defendants from failing to appear in the first place by engaging in better supervision. Even after that failure, the sureties could still have belatedly performed by preventing the defendants from fleeing outside of the United States.

Therefore, we reject the sureties' argument that the State's refusal to request extradition rendered their performance under the contract impossible. Rather, the resulting "impossibility of securing the defendant's presence" merely "may play a role in assessing a surety's motion for remission." Ventura, supra, 196 N.J. at 216. The trial court properly considered that factor in granting 30% remission.

Affirmed. The trial court's stay of the 70% forfeiture is dissolved.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION